UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

---------------------------------------------------------------x
(1) DR. COURTNEY SKIPPER-REYNOLDS,   :
:
                Plaintiff,   :   21-cv-224-GKF-SH
:
vs.   :   **AMENDED COMPLAINT**
:
(1) TULSA COMMUNITY COLLEGE,   :   PLAINTIFF DEMANDS A
:   TRIAL BY JURY
                Defendant.   :
---------------------------------------------------------------x

## AMENDED COMPLAINT

Plaintiff, Dr. Courtney Skipper-Reynolds, by and through her undersigned attorneys, alleges for her *Amended Complaint* as follows:

### PARTIES

1. Plaintiff, Dr. Courtney Skipper-Reynolds ("**Plaintiff**" or "**Dr. Skipper**") is a natural person residing in Tulsa, Oklahoma, and is African-American, .

2. Upon information and belief, Tulsa Community College, ("**Defendant**" or "**TCC**"), is a domestic, not-for-profit corporation regularly doing business and employing individuals throughout the City of Tulsa.

3. Upon information and belief, TCC employs more than five-hundred and one (501+) employees, and was, and is, regularly doing business in and throughout Tulsa, Oklahoma.

### JURISDICTION AND VENUE

4. Jurisdiction is founded upon 28 U.S.C. § 1331.

5. The EEOC issued a *Notice of Right to Sue* letter (EEOC Charge No. #564-2020-01025) dated February 23, 2021 that provided a ninety (90) day window to file suit, and Dr. Skipper's Title VII claims are therefore timely.

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) because the Defendant resides in the Northern District of Oklahoma, has substantial contacts and business dealings within and throughout Tulsa, and because a substantial portion of the events giving rise to this action took place at Defendant's Tulsa facility.

7. Plaintiff, *respectfully*, demands a trial by jury on all issues and claims to the extent permissible under the law.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

8. Dr. Skipper was employed with TCC starting in August 2018, as an adjunct professor teaching English Writing. In October 2018, Dr. Skipper also became a writing consultant for TCC.

9. Dr. Zipper belongs to the racial minority group of, and self-identifies as, African-American ("**Race**").

10. Dr. Zipper is an employee who engaged in Title VII and Section 1981 'protected activity' and belongs to the protected class of employees who advocate for employment rights ("**Retaliation**").

11. At all pertinent times Dr. Zipper was fit, qualified, and eager to hold a position at TCC, and she performed her duties in a professional and competent manner.

12. Upon information and belief, at all pertinent times, Defendant acted or failed to act by and through its duly authorized agents, servants, representatives, partners, manager, supervisors and employees, who conducted themselves within the scope and course of their

employment, with intentional malice and/or with reckless disregard to Dr. Zipper's federal statutory rights.

13. At all relevant times, April Williams ("**Ms. Williams**," believed to be Caucasian) served as the Southeast Writing Center Supervisor, and Sidney Teel served as the Director of the Writing Center.

14. On or about October 4, 2018, the first day of Dr. Skipper's employment, Ms. Williams instructed Dr. Skipper to sit at the desk directly in-front of Ms. Williams' desk. Dr. Skipper did not object and sat down.

15. The Writing Center is an open-format room with multiple desks that, customarily, any worker can choose to work at any desk on any given day. The only dedicated desk is Ms. Williams, and no other worker was ever directed to sit in a particular desk other than Dr. Skipper.

16. On or about October 5, 2018, Dr. Skipper was filling-out standard employment onboarding paperwork at the desk Ms. Williams had instructed her to sit at. Ms. Williams and two other employees began having a conversation about Ms. Williams time in Arkansas. Dr. Skipper could hear the conversation, but was not a party to the conversation.

17. According to Ms. Williams, she was a server in Arkansas and a group of African-American patrons entered the establishment. The restaurant had some sort of dress code policy preventing hats, the restaurant was attempting to use that policy to refuse service, and the African-American group wanted to pay for and receive food and drink.

18. The conversation ended between Ms. Williams and the other two employees, and Ms. Williams returned the short distance to her desk nearby Dr. Zipper. At this point Ms. Williams locked eyes with Dr. Zipper and stated, in substantial format: "I wasn't the only

3

one, the bartender didn't like the group (of black people) either. He (the bartender) said 'get those nig**rs out of here.'" Ms. Williams raised her eyebrows and said, "gotta get 'em out."

19. Dr. Skipper was shocked and did not know how to respond. However, Dr. Skipper immediately knew Ms. Williams was sending a message and warning to her. At this point Ms. Williams stopped talking to Dr. Zipper and walked away.

20. The policy, practice and actual custom in the Writing Center was to allow the writing consultants to schedule and enter their own breaks and meal breaks. However, Dr. Skipper's computer credentials never had authority to perform this action.

21. Dr. Skipper informed Ms. Williams that her credentials did not have authorization to input breaks or meal break, and Ms. Williams responded that her credentials would stay that way and that one of the student employees could input her entries.

22. In or around November 2018, Ms. Williams called Dr. Zipper to her office. In the meeting, Ms. Williams informed Dr. Zipper that she would need to work the shift hours of another (Caucasian) employee Heather (last name unknown) who no longer desired those hours.

23. During this meeting, Ms. Williams informed Dr. Zipper that if she did not accept the undesirable shift hours of another employee that she would be fired.

24. Shortly thereafter, in or around November 2018, Dr. Zipper requested a meeting with Dr. Corince Wilson (believed to be African-American), Dean of English for the Southeast Campus of TCC.

25. During the meeting with Dean Wilson, Dr. Skipper made it clear—in no uncertain terms— that she believed she was being harassed and that she believed the harassment is because of her race as an African-American.

26. During the meeting, Dr. Zipper reported to Dean Wilson, *inter alia*: (a) Ms. Williams told the story and gave the warning about "getting out the nig**rs," (b) Ms. Williams refusing to allow her to enter her own break and meal breaks, (c) Ms. Williams forcing her to sit in front of her at an assigned desk, (d) Ms. Williams threatening termination if she did not accept another employee's undesirable shift hours, and (e) the instances when Dr. Skipper—loudly and in the public arena of the Writing Center—would yell and scream at Dr. Zipper.

27. For example, on one day Dr. Zipper was running ten (10) minutes late for work, and she called in to inform the Writing Center of this fact. When Dr. Zipper arrived, Ms. Willimas screamed loudly at Dr. Zipper claiming that she had not called in. Ms. Williams professional judgment aside, and importantly for this lawsuit, the Caucasian employees were not yelled at publicly, and upon information and belief, were not yelled or screamed at privately by Ms. Williams.

28. Upon hearing this undeniable verbal complaint of race discrimination by Dr. Zipper, Dean Wilson did not open an investigation into Dr. Zipper's allegations and complaint of discrimination. Instead, Dena Wilson said, in substantial form: "Don't worry about it. I'm going to talk to April (Williams) about it."

29. It is also worth noting that it is not the case that Dean Wilson simply did not have more time to address the serious complaint, since she spent many minutes talking about irrelevant personal matters.

30. Some days after this meeting, Ms. Williams and Dr. Zipper were in another private meeting. During this meeting, again, Dr. Zipper told Ms. Williams that she believed she was being harassed and treated differently because of her race.

31. Ms. Williams responded, in substantial form: "Why do you keep complaining and bringing up the race card? You're black, and the Writing Centers don't even hire black people. You should be lucky and thankful you even have a job here."

32. Ms. Williams statement establishes many things, inter alia: (a) Ms. Williams' consciousness of Dr. Zipper's race-based complaints of perceived discrimination, (b) an admission that Ms. Williams did not care for the complaints and wanted the complaints to stop, which provides a motive for retaliation, (c) an admission that Dr. Zipper's complaints were accurate since Ms. Williams did not attack the merit of the second-class treatment allegation, and (d) an admission that race resulted in less favorable working conditions since, essentially, Dr. Zipper should sit down and be quiet and thank her stars for the job because she is black and therefore second-class treatment is perfectly fine.

33. Dr. Zipper immediately knew that the racist harassment and second-class treatment she had observed since day-one, and that she had facts to support, was just explicitly confirmed by the bad-actor herself.

34. Armed with this admission, on or around December 13, 2018, Dr. Skipper requested another meeting with Dean Wilson.

35. On or around December 18, 2018, Dean Wilson and Dr. Skipper had their second meeting. Dr. Skipper, again, complained of harassment and less favorable treatment because of her race. Dr. Skipper also told Dean Wilson about the admission Ms. Williams had made.

36. Despite this hair-on-fire complaint of race discrimination coupled with specific allegations of disparate treatment and an admission by Ms. Williams of her racist attitude and behavior, Dean Wilson did not open or refer the matter for investigation. Dean Wilson simply demurred and told Dr. Zipper to ride it out.

37. Having requested help from her immediate supervisor Ms. Williams, and Dean Wilson, Dr. Zipper tried in good-faith to endure the abuse and ride it out.

38. Unsurprisingly, Ms. Williams harassing treatment of Dr. Zipper escalated. In fact, Ms. Williams explicitly made it clear that she, in substantial form: "can make anyone do anything—or I'll fire them." Ever since Ms. Williams spoke that little gem, the other Writing Center employees shunned Dr. Zipper. There were hushed whispers and furtive eyes everytime Dr. Zipper entered or exited the Writing Center, and Ms. Williams visibly enjoyed the pain and humiliation this contumacious treatment was causing Dr. Zipper.

39. This pattern of abuse and complicity went on for months longer, and then in or around March 2019, Dean Wilson finally referred Dr. Zipper's complaint of race-based discrimination and harassment for review by the Human Resources department.

40. Mr. Jeff Ownes, HR Director, was tasked with investigating the complaint.

41. While the HR investigation was open, Ms. Williams refused to write a letter of recommendation for Dr. Zipper, and continued her harassing behavior of her.

42. In or around April 2019, Ms. Williams manufactured a lie. Dr. Zipper customarily brought coffee and said anyone—employee or student—could have some. Dr. Zipper innocently stated a fact that while she was at TPS they bought the coffee, and Dr. Zipper suggested that she could ask if TCC would do the same.

43. Ms. Williams had informants, and the informant immediately ran to Ms. Williams with this information. Ms. Williams spun it as 'Dr. Zipper is bad-mouthing and slandering TCC and promoting TPS as a better place'. Ms. Williams immediately reported this manufactured lied to HR Director Owens.

44. Owens, without investigating the manufactured lie by any of the firsthand witnesses simply went with Ms. Williams' lie, and suspended Dr. Zipper with pay on or around April 25, 2019.

45. A month later, on or around May 25, 2019, Dr. Zipper was allowed to return to her teaching duties but was force-transferred from the Southeast campus to the Northeast Campus.

46. While at the Northeast Campus, the harassment and retaliation stemming from Ms. Williams continued unabated.

47. In or around May 2020, Dr. Zipper was informed that her application was rejected and her employment would not be renewed.

## FIRST CLAIM
(42 U.S.C. § 1981 -- Status-Based Race Discrimination)

48. Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

49. TCC's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected federal rights.

50. In addition, the TCC retaliated against Bell, which is the worst form of discrimination, for having engaged in protected activity by, *inter alia*, terminating her.

51. As a direct and proximate result of TCC's intentional and/or reckless actions, Plaintiff suffered a hostile work environment, disparate treatment, as well as having suffered humiliation, lost wages, lost bonuses, inconvenience, mental distress, embarrassment, and the incursion of litigation costs and attorneys' fees.

## SECOND CLAIM
(42 U.S.C. § 1981 – Retaliation)

52. All preceding paragraphs are incorporated by reference as if fully stated herein.

53. Dr. Zipper opposed TCC's unlawful, discriminatory employment practices and engaged in protected activity under federal law.

54. TCC's retaliation would chill and deter a reasonable employee from reporting workplace discrimination and harassment because TCC continued and increased its disparate and harassing behavior of Dr. Zipper after her complaint of race-based discrimination, and then terminated Dr. Zipper because of her advocacy for her rights.

55. Upon information and belief, the TCC's actions were done intentionally or with reckless indifference to Dr. Zipper's statutorily protected federal rights, entitling her to punitive damages.

56. As a direct and proximate result of TCC's intentional and/or reckless actions, Dr. Zipper was forced to suffer disparate treatment and a hostile work environment, and suffered humiliation, lost wages, lost bonuses, inconvenience, mental distress, embarrassment, and the incursion of attorneys' fees.

### THIRD CLAIM
(Title VII – Status-Based Race Discrimination)

57. All preceding paragraphs are incorporated by reference as if fully stated herein.

### FOURTH CLAIM
(Title VII – Retaliation)

58. All preceding paragraphs are incorporated by reference as if fully stated herein.

**WHEREFORE**, Plaintiff *respectfully* demands judgment against TCC, as follows:

   A. On her First Claim, emotional, lost wage, and future lost wage compensatory damages and punitive damages to the maximum extent permissible by law, presently undetermined but in excess of $400,000 dollars, plus attorneys' fees, interest, and costs;

B. On her Second Claim, emotional, lost wage, and future lost wage compensatory damages and punitive damages to the maximum extent permissible by law, presently undetermined but in excess of $400,000 dollars, plus attorneys' fees, interest, and costs;

C. On her Third Claim, emotional, lost wage, and future lost wage compensatory damages and punitive damages to the maximum extent permissible by law, presently undetermined but in excess of $300,000 dollars, plus attorneys' fees, interest, and costs;

D. On her Fourth Claim, emotional, lost wage, and future lost wage compensatory damages and punitive damages to the maximum extent permissible by law, presently undetermined but in excess of $300,000 dollars, plus attorneys' fees, interest, and costs; and,

E. Such other and further relief as the Court deems just and proper under the circumstances.

JURY TRIAL RESPECTFULLY DEMANDED
ATTORNEY'S LIEN CLAIMED

**Dated: Tulsa, Oklahoma**
**   10 August 2021**

**Respectfully submitted,**

/s/ Thomas H. Landrum
THE FIRM ON BALTIMORE, PLLC
1811 South Baltimore Ave.
Tulsa, Oklahoma 74119
T: 918.948.6171
F: 800.460.3446

-and-

Jeffrey D. Jones, *Esq*.
(Admission Application Pending)

**THE JONES LAW FIRM**
523 East Pine Place
Tulsa, OK 74106-4301
Phone: (574) 876-4715
JJ@JeffreyJonesLawFirm.com
